UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| KENNETH KIPP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00124-JPH-DLP |
| | ) | |
| WEXFORD OF INDIANA LLC, | ) | |
| TAYLOR HILL, | ) | |
| KYLIE ROGERS, | ) | |
| TARA POWERS, | ) | |
| CHANTELL KNEPP, | ) | |
| LAUREN CUPP, | ) | |
| CHELSEY PEARISON, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Kenneth Kipp alleges that several nurses and their employer, Wexford of Indiana, LLC, were deliberately indifferent to his serious medical needs. For the following reasons, summary judgment is **GRANTED** for Wexford and **DENIED** for the defendant nurses. Dkt. [49].

**I. SUMMARY JUDGMENT STANDARD**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Cmty. Schools*, 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II. FACTUAL BACKGROUND

### A. Med Line at Wabash Valley Correctional Facility

During the time relevant to this lawsuit, Mr. Kipp was confined to a segregated cell at Wabash Valley Correctional Facility. Dkt. 51-7, p. 4. He received a daily blood pressure medication through the "med line." Dkt. 51-7, p.

5. At med line, a nurse would go to his cell to dispense his blood pressure medication. Dkt. 51-1, para. 4. Mr. Kipp interacted with each of the defendant nurses at med line in December 2020, while he was sick with Covid-19. *Id.* at 5-7.

### B. Onset of Covid-19

Mr. Kipp began to experience symptoms of Covid-19 on November 26, 2020. *Id.* at 6. He initially tried to tough it out on his own, but by November 28, he had a fever, a sore throat, chest pains, body aches, difficulty breathing, difficulty swallowing, and a debilitating headache. *Id.*; dkt. 53-1, pp. 5, 7. Mr. Kipp testified that by this time, "My head was hurting so bad it just felt like somebody was hitting me with a hammer." Dkt. 51-7, p. 6. Mr. Kipp told custody staff that about his condition on November 28, and they took him to the infirmary. *Id.*; dkt. 51-8, pp. 4-6.

Mr. Kipp's medical record from the infirmary visit states the following: "Reports headaches, fever, sore throat, and body aches. Denies [shortness of breath] and difficulty breathing. Reports sense of smell and taste." Dkt. 51-8, p. 5. Mr. Kipp took a Covid-19 test, which was positive. *Id.* at 6; Dkt. 51-8, p. 8. He did not see a physician and was given a three-day supply of Tylenol. Dkt. 51-8, p. 6. His infirmary record states, "Advised offender that [per] nursing protocol Tylenol would only be active x3 days and then a provider would have to see and order Tylenol. Offender verbalized understanding." *Id.*

### C. Worsening Condition

Over the next few weeks, Mr. Kipp's condition continued to get worse. Although he was advised to consume fluids, he was unable to swallow and became dehydrated. Dkt. 51-7, p. 4-6. He had chills, fever, profuse sweating, difficulty breathing, a loss of taste and smell, and severe headaches. *Id.* He was often too weak to get out of bed to shower, eat, or receive his daily blood pressure medication. *Id.*; dkt. 53-1, p. 5-7.

Mr. Kipp told each of the defendants that he "wasn't feeling good and couldn't hardly breathe or . . . swallow." Dkt. 51-7, p. 6. He also told them that he "need[ed] to see the doctor or at least get to the infirmary." *Id.* Each time, the defendants told him there was nothing they could do for him and that he should rest and drink plenty of water. *Id.*

Nurse Cupp remembers talking to Mr. Kipp about his worsening condition on multiple occasions. Dkt. 51-1, para. 8. On one occasion (she doesn't remember the date), she mentioned Mr. Kipp's complaints to Dr. Naveen Rajoli, who did not order treatment. *Id.* Mr. Kipp testified that Nurse Cupp contacted Dr. Rajoli in mid-to-late December, which was weeks after he first told her about his condition. Dkt. 51-7, p. 7. The other defendants do not dispute that they interacted with Mr. Kipp or that he asked them for medical attention, but they do not have independent recollections of these interactions. Dkt. 51-2, para. 8 (Hill); dkt. 51-3, para. 8 (Knepp); dkt. 51-4, para. 8 (Pearison); dkt. 51-5, para. 8 (Powers); dkt. 51-6, para. 8 (Rogers).

The defendants state that inmates sometimes ask for medical attention during med line. *See* dkts. 51-1 to -6 at para. 6. Their general practice is to inform inmates that they must submit a Request for Health Care form to get medical attention. *Id.* "The only exception to this would be in a situation where the patient presents with an emergent condition that requires immediate attention, such as active bleeding or a potential myocardial infarction, as well as other potential emergent needs. In that situation, I would stop what I am doing and address the emergent need." *Id.*

Mr. Kipp testified that none of the defendants told him to submit a Request for Health Care form, that instead, they merely said there was nothing they could do. Dkt. 51-7, p. 7. Mr. Kipp testified that he knew how to submit a Request for Health Care form, "but at the same time, when I see each one of those nurses at [med line], I should have never had to write a request out. I couldn't even get out of bed, so how could I write a request for help when I'm asking you directly?" Dkt. 51-7, p. 7.

Mr. Kipp testified that the defendants had a list of inmates who had tested positive for Covid-19. Dkt. 51-7, p. 8. He also testified that the nurses used language that indicated they knew he was infected. *E.g.*, *id.* at 6 ("When [Nurse Hill] brought me my blood pressure medicine, I asked for some more Tylenol. I asked for some type of pain medication. [She said] the same thing, there's nothing they can do for me. Lay down get plenty of rest. *You're isolated.*") (emphasis added). The defendants do not dispute that they knew Mr. Kipp had Covid-19 when they saw him at med line and heard him complain about difficulty

breathing, difficulty swallowing, severe pain, and other worsening symptoms. *See generally* dkts. 51-1 to -6 (defendant affidavits).

Mr. Kipp has submitted affidavits from fellow inmates Austin Scott and Montez Harris. Dkts. 53-1, pp. 5-7. Mr. Scott and Mr. Harris were confined in nearby cells and observed Mr. Kipp's worsening condition in December 2020. *Id.* According to Mr. Scott:

> From December 2nd to the 11th, Mr. Kipp begged for help and relief from the medical staff. He was in such distress he wasn't eating, bathing, or even getting up to take his blood pressure medication 'cause he wasn't able. Mr. Kipp was in such a shape I had to stay awake to make sure he had someone there to listen if he needed help, God forbid if he would have died alone.

*Id.* at 6 (cleaned up).

> According to Mr. Harris:

> Every day I was hearing him cough and ask for help. By this time, he was out of Tylenol and was telling every nurse at med pass that he couldn't breathe and that he needed help. From 12/2/20 through 12/11/20, Kenneth took only one shower and barely grabbed his meals. More than one nurse told him after three days of Tylenol, they can't help him. That he would just have to ride it out.

*Id.* at 7 (cleaned up).

### D. Eventual Treatment

By mid-December, Mr. Kipp's condition began to improve. Dkt. 51-7, p. 8. On December 12, he was able to submit a Request for Health Care form describing his lack of care. Dkt. 51-8, p. 8. Non-party nurse Terry Auler responded to this health care request and wrote, "I understand you are saying you were in pain for 14 days, but if you would have submitted a Request for Health Care [we] could have scheduled you for further evaluation." *Id.* Mr. Kipp

did not see a physician or receive treatment in response to this Request for Health Care form. *Id.*

On December 18, Mr. Kipp submitted a second request for health care form. *Id.* at 7. On December 21, Dr. Samuel Byrd met with Mr. Kipp and prescribed a seven-day supply of antibiotics, prednisone, and Tylenol. *Id.* Mr. Kipp testified that Tylenol alleviated his headaches. Dkt. 51-7, p. 7.

Mr. Kipp complained about his Covid-19 treatment through his facility's administrative grievance process. Dkt. 53-1, p. 1. His grievance was reviewed by Health Services Administrator K. Hobson, who made the following determination: "Nursing are to check each offender that is positive daily for temperature and symptoms. After previewing your chart nursing failed to assess you every day. This will be addressed with staff." *Id.*

### III. Discussion

#### A. Deliberate Indifference

Because Mr. Kipp is a convicted prisoner, his medical treatment is evaluated under the Eighth Amendment, which proscribes cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a

plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 772, 727-728 (7th Cir. 2016) (en banc). The defendants do not dispute that Mr. Kipp's Covid-19 infection was a serious medical condition. Thus, the availability of judgment as a matter of law turns on whether there is sufficient evidence upon which a reasonable jury could conclude that they were deliberately indifferent to Mr. Kipp's condition.

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is a subjective test: "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728. A court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728. When a claim for deliberate indifference is premised on a delay in treatment, the issue is whether "the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). The length of delay that is tolerable "depends on the seriousness of the condition and the ease of providing treatment." *Id.*

### B. Individual Defendants

At this summary-judgment stage, the individual defendants do not dispute that Mr. Kipp's Covid-19 infection was objectively serious, that they knew he was

8

in severe pain and was not receiving any treatment, and that they (except Nurse Cupp) made no effort to provide him with treatment or alert other members of the medical staff to his worsening condition. *See* dkt. 50 at 13–16.

### 1. Failure to Submit a Request for Health Care Form

The defendants argue that they did not have to help Mr. Kipp because he did not submit a Request for Health Care form. Dkt. 50, pp. 16-17.

Mr. Kipp has designated evidence that he was so ill that he often could not get out of bed, shower, eat, or come to the cuff port to receive his blood pressure medication and that for weeks he was too debilitated to submit a Request for Health care form. Dkt. 51-7, p. 7; dkt. 53-1, pp. 5-7. This evidence supports a reasonable inference that Mr. Kipp's only option was to ask the defendants for help during med line. The evidence also supports a reasonable inference that the defendants—trained medical professionals—knew Mr. Kipp needed medical attention. They knew he had Covid-19; that he was receiving no medical treatment; that he had hypertension; that he had trouble breathing, trouble swallowing, fever, chills, chest pain, headaches, a lack of taste and smell; and that he often could not get out of bed to receive his blood pressure medication. *Id.* at 6-7.

Taking this evidence in the light most favorable to Mr. Kipp, a reasonable jury could conclude that his need for medical attention was obvious and that the defendants' refusal to provide him with treatment or alert other members of the medical staff constituted deliberate indifference. *Cf. Dixon v. County of Cook*, 819 F.3d 343, 350 (7th Cir. 2016) (holding that a reasonable jury could find a nurse

9

deliberately indifferent based on his refusal to provide medical care or contact a physician in response to an oral request to treat an inmate with intense abdominal pain, difficulty breathing, difficulty with leg movement, and incontinence: "A jury could find that this was an obvious enough problem that even a layperson who discovered it would have at least consulted a doctor for instructions, and failing that would have called 911 for emergency help.").

### 2. Interference with Med Line

The defendants argue that providing medical attention to Mr. Kipp would have interfered with their duty to dispense medication. Dkt. 50, p. 17. Courts are mindful of the "division of labor within a prison," and for this reason, the liability of non-medical prison officials is limited in Eighth Amendment medical cases. *See Arnett*, 658 F.3d at 755. But in this case, the defendants were members of the medical staff, and the designated evidence shows that after their med line duties were complete, they told Mr. Kipp that they could not help him. Dkt. 51-7, pp. 6-7.

### 3. Inability to Recall Specific Dates

The defendants argue they are entitled to summary judgment because Mr. Kipp does not recall the specific dates when he reported his symptoms to each defendant. Dkt. 50, pp. 16-17. The defendants cite no legal authority in support of this argument. *Id.*

Recalling the specific date on which an event occurred is "a matter that naturally might be difficult to pinpoint." *McCann v. Iroquois Memorial Hospital*, 622 F.3d 745, 751 (7th Cir. 2010) (holding that the plaintiff's recollection that

unlawful wiretapping occurred on a day in February was sufficient to defeat the defendant's motion for summary judgment). In this case, Mr. Kipp testified that he spoke with each defendant about his medical condition in the first half of December 2020, while he was feverish, dehydrated, in pain, and struggling to breathe. Mr. Kipp's inability to recall the specific dates when he interacted with each defendant may be relevant in weighing his credibility, but credibility determinations are not appropriate at the summary judgment stage. Instead, the Court merely reviews the evidence in the record and determines whether there is a triable issue of fact. *Id.* at 752 ("Even if one side's story is more believable," at summary judgment the court must "avoid the temptation to decide which party's version of the facts is more likely true."); *CMFG Life Ins. Co. v. RBS Securities, Inc.*, 799 F.3d 729, 745 (7th Cir. 2015) (although a witness's recollection of the defendant's misrepresentation in a mortgage-backed securities lawsuit was "thin on specifics" and did not include "specific dates and locations," summary judgment for the defendant was improper because "the deficiencies [in the witness's testimony] go to weight, a matter appropriately addressed by the factfinder at trial.").

### 4.  Need for Additional Care

The defendants argue there is no evidence that providing Mr. Kipp with medical care would have improved his condition. Dkt. 54, p. 2. They also argue that Covid-19 is a novel virus, that treatment options for Covid-19 were limited in 2020, and that the directions from the Indiana Department of Correction about Covid-19 were still evolving at that time. Dkt. 50, p. 19.

This argument is unresponsive to evidence that Mr. Kipp received no medical care for three weeks, despite telling medical staff that he had severe headaches, fever, dehydration, and sore throat. So even assuming that no COVID-specific treatments were available, Defendants have not shown why readily available treatments commonly used to alleviate Mr. Kipp's symptoms were not used, e.g., Tylenol for headaches and fever, IV fluids for dehydration, and similarly common treatments for sore throat, chills, and profuse sweating. Further, Mr. Kipp testified that Tylenol was effective at treating his headaches, and Dr. Byrd prescribed Tylenol and prednisone on December 21. Dkt. 51-7, p. 6; dkt. 51-8, p. 7. This evidence supports a reasonable conclusion that efficacious treatment options were readily available to Defendants. Dkt. 51-8, p. 7.

### 5. Nurse Cupp

Nurse Cupp argues that she was not deliberately indifferent to Mr. Kipp's serious medical need because she brought his condition to Dr. Rajoli's attention, who did not order any treatment or schedule an appointment. Dkt. 50, p. 15. Nurses may generally defer to the treatment decisions of physicians, but they may not turn a blind eye to a prisoner's condition. *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012).

In this case, deference to treatment decisions of a supervising physician does not entitle Nurse Cupp to summary judgment. First, there is evidence that Nurse Cupp ignored Mr. Kipp's requests for weeks and did not contact Dr. Rajoli until mid-to-late December. Dkt. 51-7, p. 7; dkt. 51-1, para. 8. Second, it is not

clear what Nurse Cupp communicated to Dr. Rajoli about Mr. Kipp's medical condition. In her affidavit, Nurse Cupp merely states that she recalls "discussing Mr. Kipp's complaints directly with Dr. Naveen Rajoli after completing med line." Dkt. 51-1, para. 8. This testimony does not reveal what she told Dr. Rajoli, so the Court cannot determine whether Nurse Cupp conveyed all material information to Dr. Rajoli—in which case she may have been entitled to defer to his judgment—or if she downplayed Mr. Kipp's symptoms or only told Dr. Rajoli about some of the symptoms, which would not enable Dr. Rajoli to make an informed medical judgment.

Given the lack of evidence about what Nurse Cupp told Dr. Rajoli about Mr. Kipp's condition, Nurse Cupp's characterization of Mr. Kipp's condition in her affidavit, and the evidence that she waited weeks before contacting Dr. Rajoli, there is evidence from which a jury could reasonably conclude that Nurse Cupp was deliberately indifferent to Mr. Kipp's serious medical need and delayed his treatment.

Summary judgment for Nurses Cupp, Hill, Knepp, Pearison, Powers, and Rogers is **DENIED**.

### C. Wexford

Mr. Kipp is proceeding against Wexford under the theory set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). To prevail, Mr. Kipp must show that he was deprived of constitutionally adequate medical care as a direct result of a Wexford policy or custom and that Wexford "took the action with

conscious disregard for the known or obvious risk of the deprivation." *Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 236 (7th Cir. 2021).

In his complaint, Mr. Kipp alleged that Wexford maintained a policy or custom of failing to adequately train its nurses to treat inmates with Covid-19. Dkt. 1, pp. 10-11 (complaint); dkt. 6, pp. 2-3 (screening order). But in his deposition, Mr. Kipp testified that he did not have any knowledge about Wexford's policies or procedures for training its nurses. Dkt. 51-7, p. 10. HSA Hobson's response to Mr. Kipp's grievance states that the nursing staff was supposed to check the temperature and symptoms of inmates who had tested positive for Covid-19 every day but that, for Mr. Kipp, the nursing staff did not follow this policy. Dkt. 53-1, p. 1. There is no evidence that this failure arose from a failure of Wexford to adequately train its nurses.

Nor can Wexford be liable on any other theory of *Monell* liability. *See Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022) ("Monell liability is rare and difficult to establish."). Mr. Kipp admits that he has no evidence of "an official policy adopted and promulgated by [Wexford's officers]." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010); *see* Dkt. 53 at 2 ("The state does not give offenders medical policy or procedures so there is no way of me knowing or getting [them]."). And Wexford has designated evidence that the COVID policies in place at the time were instead "created by the Indiana Department of Corrections." Dkt. 50 at 5 (citing affidavits at dkt. 51-1 through 51-6). Those policies "were ever changing throughout the months, based upon new directions from the Department of Corrections, the Indiana Department of

14

Health, [and] the Centers for Disease Control." *Id.* There is no evidence that any iteration of those policies—even if they had been created and adopted by Wexford—instructed Wexford or its employees to fail to provide medical care to inmates in Mr. Kipp's condition. *See id.*

Without an express policy causing the injury, "[t]o establish deliberate indifference to the purportedly unconstitutional effects of a widespread practice, [Mr. Kipp] must point to other inmates injured by that practice." *Stockton*, 44 F.4th at 617. He has not done so. Instead, Mr. Kipp has designated evidence of only his own experience. *See* dkt. 53; *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016); *Thomas*, 604 F.3d at 303 ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than once instance . . . or even three."). Without that evidence, no reasonable jury could find that Wexford should have "conclude[d] that the plainly obvious consequences of the practice would result in the deprivation of a federally protected right, as is required to establish deliberate indifference." *Id.*

Accordingly, Wexford's motion for summary judgment is **GRANTED**.

## V. CONCLUSION

The motion for summary judgment, dkt. [49], is **GRANTED** for Wexford and **DENIED** for Nurses Lauren Cupp, Taylor Hill, Chantell Knepp, Chelsey Pearison, Tara Powers, and Kylie Rogers. The claims against the nurses **SHALL PROCEED**. Given the challenges of late-state litigation, the Court will attempt to recruit pro bono counsel on his behalf. The Court will set a telephonic status conference in due course.

The **CLERK IS DIRECTED** to terminate Wexford as a defendant and change the names of the remaining defendants on the docket to reflect the names listed in the caption of this Order.

**SO ORDERED**.

Date: 9/30/2022

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

KENNETH KIPP
110393
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com